**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,**

                         **Plaintiff,**                  **06-CR-345A(Sr)**

     **v.**

**CURTIS GROCE,**

                        **Defendant.**

---

## REPORT, RECOMMENDATION AND ORDER

This case was referred to the undersigned by the Hon. John T. Elfvin, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions. (Docket. #11). The case was subsequently transferred to the Hon. Richard J. Arcara.

## PRELIMINARY STATEMENT

The defendant, Curtis Groce, is charged in an indictment with violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). By Notice of Motion filed October 29, 2006, defendant moved to suppress[1] the firearm and ammunition found on his person during the course of a traffic stop on April 7, 2006, as well as certain statements made to law enforcement officers following his arrest. (Docket #3).

---

[1] Defendant's Omnibus Discovery Motion is addressed in a separate Decision and Order.

The government filed a response in opposition to defendant's motion on November 13, 2006.  (Docket  #6).  An evidentiary hearing was conducted on November 29, 2006 and a transcript of the proceedings was prepared and filed thereafter.  (Docket  #9).  The defendant was granted an extension of time to file his memorandum of law, but did not do so.  The government filed its memorandum of law on June 19, 2007 (Docket  #13), at which time the motion to suppress was taken under advisement.

#### **FACTS**[2]

City of Buffalo Police Officers Joseph Gramaglia and Joseph Ruggierio were operating stationary radar in their patrol car at Main and Laurel Streets in the City of Buffalo at approximately 10:15 p.m. on April 7, 2006 when they observed an older model, white, Ford Escort station wagon traveling northbound on Main Street at 49 miles per hour.  (T. 14-15, 74-75).   The posted speed limit was 30 miles per hour.  (T. 16).  Officer Gramaglia activated the lights on the patrol car and the vehicle pulled over on  Main Street.  (T. 17-18).  Officer Gramaglia approached the driver and his partner approached the front seat passenger.  (T.18-19, 75-76).

Officer Gramaglia asked the driver for his driver's license and registration for the vehicle.  (T. 19).  The driver was unable to produce these documents, but advised Officer Gramaglia that he was Antonio Cole, a Federal agent, and produced a

---

[2] The facts are taken from the transcript of the evidentiary hearing conducted on November 29, 2006 (Docket  #9), and references to same are designated as "T" followed by the appropriate page number or numbers.

gold-colored badge.  (T. 19).  Upon further questioning, Mr. Cole told Officer Gramaglia that he worked for CSI or the Criminal Service Intelligence within the Department of Justice.  (T. 19-20).  Officer Gramaglia had never heard of this agency and thought the badge "looked kind of odd," so he asked Mr. Cole for photographic identification.  (T. 20).  Mr. Cole produced a photographic identification with his name and a "Department of Justice" heading.  (T. 20).

In response to further questioning, Mr. Cole advised Officer Gramaglia that he had just transferred to this area from Maryland and worked "warrants."  (T. 21). Mr. Cole indicated that he and his passenger "just left 49 Johnson Park" where they "were doing some work" and that he does "warrants."  (T. 21).  Officer Gramaglia testified that Mr. Cole was growing increasingly agitated at his questions, but was unable to produce a driver's license or to provide Officer Gramaglia with the name or telephone number of his supervisor. (T. 20, 22).

Before heading back to his patrol car to attempt to verify Mr. Cole's information, Officer Gramaglia asked him if he was armed.  (T.24).  Mr. Cole responded affirmatively and opened his right-side jacket pocket to show Officer Gramaglia a holster containing what appeared to be a semi-automatic handgun.  (T. 24).

Officer Ruggierio asked the passenger for identification and was provided a New York identification card with the name of Curtis Groce.  (T. 76).  The officers returned to their patrol car and ran the driver and the passenger through the New York

and Maryland databases.  (T. 25).  Officer Gramaglia also contacted his lieutenant by cell phone and advised him of the situation.  (T. 25-26).  The lieutenant advised Officer Gramaglia to bring Mr. Cole and his passenger back to the station so that they could confirm his employment.  (T. 26).   While he was speaking with the lieutenant, the New York State database revealed that Mr. Cole had a suspended license, which the police officers thought unusual for a law enforcement officer.  (T. 26, 79).  The database also revealed that Mr. Groce was the subject of a parole violation warrant from Ohio.  (T. 27).  Officer Gramaglia called for a second car to assist at the scene.  (T. 27, 80).

When Officer Gramaglia returned to the vehicle, he advised Mr. Cole that his lieutenant wanted to speak with him at the station house and that he needed to secure his weapon.  (T. 29).  Mr. Cole continued to behave in an agitated manner and argued about giving up his weapon.  (T. 29).  Officer Gramaglia advised Mr. Cole that "if [Mr. Cole] wanted to keep this peaceful, that he was going to step out and he was going to immediately place his hands on the roof of the car and [Officer Gramaglia] was going to remove his weapon and frisk him for any other weapons."  (T.30).  Mr. Cole exited the vehicle and placed his hands on the car, but when Officer Gramaglia moved the right side of his jacket, he observed an empty holster.  (T.30).  Officer Gramaglia asked Mr. Cole where the weapon was and he responded that he had placed it on the floor of the vehicle.  (T.30).  Officer Gramaglia ultimately recovered the weapon he had observed in Mr. Cole's holster from the floor of the vehicle and discovered that it was actually a pellet gun.  (T. 31, 83).

Officer Ruggierio was standing on the passenger side of the vehicle when he heard Officer Gramaglia exclaim that there was no weapon in the holster. (T.31, 82). Upon hearing that the weapon was unaccounted for, Officer Ruggierio immediately opened the car door, grabbed Mr. Groce and instructed him to step out of the vehicle. (T. 83). Mr. Groce complied, at which point Officer Ruggierio placed Mr. Groce on the car, patted him down and discovered a .41 caliber Ruger revolver in his waistband. (T. 31, 82-83). Officer Gamaglia testified that approximately five minutes elapsed from the time the vehicle was stopped until the occupants of the vehicle were removed from the vehicle. (T. 44).

At this point, Mr. Cole and Mr. Groce were both placed under arrest and into the back of the patrol car in handcuffs. (T. 31-32). Officer Gramaglia advised Mr. Cole and Mr. Groce of their rights in accordance with *Miranda v. Arizona*, 384 U.S. 436 (1986), and asked them both if they understood those rights. (T.32, 84). Mr. Cole and Mr. Groce responded, "yes." (T.32). Thereafter, Officer Gramaglia asked Mr. Groce where he obtained the gun that was found in his possession. (T. 32). Mr. Groce told Officer Gramaglia that he found the gun at 49 Johnson Park and that he thought it was permissible to hold it because he "was with one of you," indicating Mr. Cole. (T. 33). When Officer Gramaglia informed Mr. Groce that Mr. Cole was not a law enforcement officer, Mr. Groce indicated that he "thought he was a cop this whole time." (T. 33). Mr. Groce also confirmed that he had served eleven years in Ohio for shooting someone. (T. 63). Back at the station, Mr. Groce spontaneously stated to Officer

Ruggierio that he thought Mr. Cole was a cop, that Mr. Cole was his wife's brother, that

he had just met Mr. Cole a couple of days ago and that he thought it would be all right

to pick up the gun because he was "with a cop."  (T. 85).


Lieutenant Keane asked Officer Gramaglia if the defendant had received

his *Miranda* warnings and was told that he had.  (T. 100).  Lieutenant Keane also

confirmed that the  defendant understood those warnings before asking the defendant if

he would speak with him.  (T. 100).  The defendant proceeded to tell Lieutenant Keane

that he had served eleven years in prison in Ohio for shooting someone and that he

found the gun not long before his arrest.  (T. 101).


## DISCUSSION AND ANALYSIS

In his original motion papers, defendant argued that the stop of the

vehicle in which Mr. Groce was a passenger was not supported by probable cause.

(Docket #3, pp. 6, 8-9).  Defendant also argued that the police officers lacked

reasonable suspicion that he was armed and dangerous as required to justify the

search of his person.  (Docket  #3, pp.7-9).


The government responds that there was probable cause to believe that

the vehicle was speeding, thereby justifying the traffic stop.  (Docket  #13, p.5).  The

government argues that police officers are authorized to ask for identification and  run a

background check on a passenger in a stopped vehicle.  (Docket #13, pp.11-12).  Once

the background check revealed an outstanding warrant against the passenger, the

government argues that there was probable cause to arrest the defendant and conduct

a search incident to the arrest.  (Docket  #13, pp. 12-14).  Regardless of the warrant,

the government asserts that there was reasonable suspicion to remove Mr. Groce from

the car and frisk him once Mr. Cole informed the police officers that he had placed his

weapon on the floor of the vehicle in which Mr. Groce was a passenger.  (Docket  #13,

pp.6-9).


        A traffic stop is a seizure within the meaning of the Fourth Amendment.

*Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  "As a general matter, the decision to

stop an automobile is reasonable where the police have probable cause to believe that

a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806 (1996); *see*

*United States v. Scopo*, 19 F.3d 777, 782 (2d Cir.) ("When an officer observes a traffic

offense - however minor - he has probable cause to stop the driver of the vehicle."),

*cert. denied*, 513 U.S. 877 (1994).  In the instant case, Officer Gramaglia testified that

he was operating stationary radar when he observed the vehicle traveling at a high rate

of speed and confirmed with radar that the vehicle was traveling 49 miles per hour on a

street with a posted speed limit of 30 miles per hour.  (T. 14-16, 75-76).  As a result, the

stop of the vehicle was proper.


        The United States Supreme Court has recently confirmed that the  Fourth

Amendment analysis does not distinguish between the driver and the passenger

subjected to a traffic stop. *See Brendlin v. California*, __ U.S. __, 127 S. Ct. 2400, 2406

(April 23, 2007) ("during a traffic stop an officer seizes everyone in the vehicle, not just

the driver.").  In analyzing the appropriate scope of law enforcement conduct during such a seizure, the Supreme Court has determined that "the usual traffic stop is more analogous to a so-called '*Terry* stop' than to a formal arrest."  *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (internal citation omitted).  As a result, persons temporarily detained pursuant to ordinary traffic stops are not "in custody" for the purposes of *Miranda*.  *Id.* at 440.  Such an "investigatory detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."  *Florida v. Royer*, 460 U.S. 491, 500 (1983).  In addition, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  *Id.*

The Supreme Court has noted that "questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops."  *Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County*, 542 U.S. 177, 186 (2004); *see Berkemer*, 468 U.S. at 439 ("officer may ask the detainee a moderate number of questions to determine his identity").  "The officer may also prolong the detention to investigate the driver's license and the vehicle registration, and may do so by requesting a computer check."  *Id.* (internal citation omitted) (collecting cases), *citing Prouse*, 440 U.S. at 657-59.  In addition, law enforcement officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop."  *United States v. Hensley*, 469 U.S. 221, 235 (1985).  "This includes conducting a protective search of the driver, the passengers, and the vehicle."  *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir.) (internal citations

omitted), *cert. denied*, 534 U.S. 830 (2001), *citing Pennsylvania v. Mimms*, 434 U.S. 106, 111-12 (1977) and *Michigan v. Long*, 463 U.S. 1032, 1049-51 (1983).  "Many courts have recognized that knowledge of the criminal histories of a vehicle's occupants will often be relevant to that safety."  *Id.* at 1278 (collecting cases).  "Considering the tragedy of the many officers who are shot during routine traffic stops each year, the almost simultaneous computer check of a person's criminal record, along with his or her license and registration, is reasonable and hardly intrusive."  *United States v. McRae*, 81 F.3d 1528, 1536 n.6 (10th Cir. 1996).

Applying these principles to the instant case, it was appropriate for Officer Ruggierio to ask the defendant for identification and to check that identification against New York State Department of Motor Vehicles' database based solely on his status as a passenger in the vehicle which was stopped for speeding.  However, the Court notes that such an inquiry was specifically warranted given Officer Gramaglia's increasing suspicion of  the armed driver's claim that he was a federal agent who was working with the defendant.  The Court also notes that there is no indication in the record of these proceedings that doing so unreasonably enlarged the duration of the traffic stop, which lasted approximately five minutes from the time the vehicle stopped until the occupants were arrested.

Once the computer check revealed a warrant for the defendant's arrest, the officers possessed probable cause to arrest him.  *See United States v. Miller*, 382 F. Supp.2d 350, 368-69 (N.D.N.Y. 2005) (discussing cases upholding arrest as

objectively reasonable regardless of validity of court-generated warrant and noting that "[n]umerous courts in this Circuit have adopted the proposition that probable cause to arrest exists on the basis of a computer hit where there is no evidence that the information contained in the computer was false or invalid.").  As in *Miller*, in the instant case, "there is no dispute that the . . . warrant was valid."  *Id.*

Since Officer Ruggierio had probable cause to arrest the defendant, he was permitted to conduct a search incident to that arrest.  *United States v. Robinson*, 414 U.S. 218, 234 (1973).  So long as the "formal" arrest follows quickly on the heels "of the challenged search [it is] not . . . particularly important that the search preceded the arrest rather than vice versa'."  *United States v. Donaldson*, 793 F.2d 498, 503, (2d Cir. 1986), *cert. denied*, 479 U.S. 1056 (1987); *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980); *United States v. Vasquez*, 638 F.2d 507, 523-24 (2d Cir. 1980), *cert. denied*, 454 U.S. 847 (1981).  Alternatively, the removal of the defendant from the car and frisk of his person for weapons was a reasonable response to the driver's declaration that he had placed the object in his holster, which Officer Gramaglia had previously observed to be a semi-automatic handgun, on the floor of the car in which the defendant was seated.  *See Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993).

The Court credits Officer Gramaglia's testimony that he provided *Miranda* warnings to the driver and the defendant following their arrests and that each of them responded affirmatively when asked if they understood these warnings.  As a result, there is no basis for suppressing the defendant's statements.

## CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that defendant's motion (Dkt. #3), to suppress be **DENIED**.

_____Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

_____This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Crim. P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).  **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for

the Western District of New York, "written objections shall specifically identify the

portions of the proposed findings and recommendations to which objection is made and

the basis for such objection and shall be supported by legal authority."  **Failure to**

**comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2**

**(concerning objections to a Magistrate Judge's Report, Recommendation and**

**Order), may result in the District Judge's refusal to consider the objection.**



/s/ H. Kenneth Schroeder, Jr.

_____
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**


   **DATED:**      **Buffalo, New York**
                **January 2, 2008**